Good morning. May it please the court. I am Peter Katsaros, appearing on behalf of the appellant, Lt. Michael Woods. We appear before the court today asking for a reversal of the summary judgment entered against the plaintiff on five counts of his complaint, employment discrimination case. That summary judgment was entered because the trial judge felt that there was no material issue of fact as to the application of the cat's paw theory to the plaintiff's claim. We ask that the court reverse and remand for trial on the four claims, age discrimination, American for Disability Act, workman's comp retaliation, Family Medical Leave Act retaliation. I'd like to turn to cat's paw first. I never thought I would be appearing in this distinguished court talking about cats and monkeys, but the case calls for it. We believe that there's substantial evidence of animus by the fire chief in Berwyn and that he put in motion charges of dismissal that were intended to result in the plaintiff's dismissal and did. What about the plaintiff? Lt. Woods worked for 23 years as a fireman in this district with a virtually unblemished record. Two promotions, he was head of a fire company as a lieutenant and he was in charge of training for the entire fire department. And in that 23 years, members of the court, he had no history of violent conduct. No one thought Mike Woods was violent. What about the fire chief who was the antagonist here and the monkey in this case? He told Woods a month before Woods was suspended that only I can fire you. He did not tell Woods only I can fire you with the approval of the police and fire commission. He said only I can fire you. He also testified in his deposition that he ran the fire department and the police and fire commission had nothing to do with the operation of the fire department. And he said that in the 10 years that he was in the management of this fire department, not one disciplinary move recommended by the management of the fire department had ever been we believe operated with discriminatory animus, put in motion a 15-month campaign to oust this veteran from his job. He thought he was too old. He thought he had a bad back. He was mad at him because he took family medical leave act for two months of talk therapy. And he was mad at him because he filed an expensive workman's compensation claim. That workman's compensation claim was filed in March of 2010 following a serious back injury in January where Lieutenant Woods helped move a 350 plus pound woman a heart attack victim out of a house and re-injured his back. How much did she weigh? She weighed over 350 pounds. 650 pounds in your brief. I thought that was pretty good size. A weighty individual, certainly. O'Halloran started a 15-month campaign to oust Woods. He started as soon as Woods got back in June of 2010 when Woods came back on light duty. And O'Halloran, without any inquiry by Woods, went into Woods' office and said, you can leave the department two ways on disability or you can retire. Woods wasn't interested in disability. He was returning to work on light duty. Shows the center of the fire chief. Then by the fall of 2010, Woods sought a position as training officer in the district. O'Halloran didn't like that. He wanted a younger man in the job and he encouraged Lieutenant Letito to apply for that job. Letito was loyal to Woods and did not. Woods got the job by operation of the collective bargaining agreement. And when he got into the job, they made it, they set him up to fail. This is a well-established fire department in suburban Chicago. And in walks Woods to become the training officer. And he walks into a training office with no lesson plans. The prior training officer, no lesson plans left behind. Woods struggled with the beginning of the job and he asked his deputy superintendent, Domena, for some help. And Domena said, you shouldn't have took the job. You should know the job. And then they criticized him for the next five or six months. A month before Woods was suspended, he was stoking a very hot fire, a training exercise. In walks fire chief O'Halloran, walks by Woods and goes, Mike, it's a job for a younger man. And then when on the eve of the 26th, Woods meets with fire chief O'Halloran and says, I can't take this training officer job anymore. I want to go back to the line. I want to go back to my fire truck. I don't think you're being fair to me. So O'Halloran said, okay, you can go back to the fire truck. But O'Halloran said in his deposition, I thought Woods was going to have a psychological episode like back in 2009 when he took talk therapy for a couple months. That was again, the center of the fire chief, age discrimination and disability, back and mental. That campaign to force Woods to resign did not work. Woods did not resign. He did not take early disability. He resisted the bullying and they took turns threatening to fire him. Two weeks before June 3rd, deputy chief Domena waves off a union representative, gets Woods in a room and says, you're either going to retire or we're going to fire you. And then coming on the heels of that threat, fire chief O'Halloran meets with him. So when the campaign didn't work, the fire chief went to his computer and he wrote up nine pages of charges of dismissal for an alleged threat on June 3rd, for an alleged argument and abuse of conduct on June 3rd, for a violation of a criminal statute for disorderly conduct, and for ungentlemanly conduct. And then he prosecuted Woods before the police and fire commission. He recommended, he said it's in the best interest of this fire department to remove this man from service. It's my opinion. I run the department and he presented that to the police and fire commission. When we got to the police and fire commission, the first thing we did was say, we don't believe our case belongs here. Under the collective bargaining agreement, members of the Wood's had the sole right to choose whether he wanted a discharge case heard before the police and fire commission or a labor arbitrator, the traditional forum for deciding. And he chose the labor arbitrator and the police and fire commission refused to yield jurisdiction, made us go forward with the hearing. Midway through the hearing, after the fire chief had put on his case, the chairman of the commission was ready to rule. We hadn't put on our case. And then he was nudged by a lawyer who said, you know, who pointed to our side, and then we got to put on our defense. And because the plaintiff has allowed the benefit of favorable inferences on this summary judgment review, I must ask you to take a look at exhibit B to the appellant's appendix. In exhibit B to the appellant's appendix, you will find a one-page opinion, which is written three weeks before the evidentiary hearing before the police and fire commission. A decision was made before the evidence was even taken, we believe. With respect to the discriminatory animus, we believe there is substantial evidence in the discipline as Woods. Mr. Cooper threatened to kill a deputy chief in the fire department, was never written up for any charge. Another one was indicted for assault and battery. He's still working there. There's substantial evidence of pretext in this record. Well, the comments he made about wanting to kill somebody, they were made to someone who was his friend, right? Hamilton, who actually took notes on it? Your Honor, Lieutenant Woods denied ever making those threats. He denied ever making those threats. Oh, I understand he denied it, but I mean Hamilton testified. Hamilton did, but his actual written statement of the day does not have a threat in it. And that's the point. That's the point we made in the deposition. But he did make a note of it, right? He made a note of Woods' statements to him. He made a note of Woods' general mention, but nobody, no victim was identified and no intent to harm was ever found in that material. Like in Coleman, this court's decision in Coleman, we don't believe that rises to the level of a threat. And like in Coleman, none of the charges matched the rules in this case. There was never a prosecution for disorderly conduct. There was never a fight. Hamilton's statement doesn't support that. And all the professional evidence from a clinical psychologist said he was fit for duty. So we ask that you reverse and remand and we appreciate it. I'll give you a minute for rebuttal, although you're out of time. Thank you. You'll have another minute. May it please the court. Counsel. Mr. Katsura spent most of his time talking about the facts and I think that our briefs very, very thoroughly discussed those facts and I think that our briefs have responded to just about everything that he said. And I don't want to reiterate all of that here with one exception. Counsel referred to the note that Mr. Hamilton prepared, or Lieutenant Hamilton prepared, and said that it didn't support his claim. I mean, the key here is our position that the decision maker was the board. The evidence was presented to the board. Testimony was presented to the board. What the court will find is that that entire argument about the note not constituting a threat or that Hamilton's testimony did testify that Woods threatened to kill his supervisors. Hamilton said that very clearly, very unequivocally in his testimony before the board. The point that counsel makes about that being inconsistent with the note was never the subject of cross-examination to Lieutenant Hamilton during the hearing, nor was it addressed in closing argument. Plaintiff is effectively asking this court to say that the board should have decided differently based upon information that it never even argued to. As I say, the key issue here that I'd like to talk about rather than the facts, because I think that that has been done pretty thoroughly, is the law. Staub teaches us that there is a difference between a causal factor and a motivating factor. There is simply no question here that Chief O'Halloran was a causal factor in Woods' discharge. The key issue, though, before this court is more than that, and that is whether when counsel refers to the monkey, I frankly I don't like referring to any individual as that. I think that the Tenth Circuit probably got it a little bit better when it uses the term an allegedly biased subordinate, but the Supreme Court makes the distinction. It's hard to remember. It's true, unfortunately. The Supreme Court uses the term firing authority and recommending authority in the Staub case, but there's no evidence here that the recommending authority that any alleged bias poisoned the process, to use that term. That there's no suggestion that any improper animus from Chief O'Halloran was involved at all in the discharge decision. It's important to recognize that the charges, this incident on June 3rd, did not originate from the Chief. This is something that it was a friend of Woods who reported it first to his union vice president, who was told to then report it to the union president, who was then told to report it to the acting deputy chief, who was then told to report it to the assistant chief, finally before it came up to Hamilton, before it came up to O'Halloran. There's no suggestion in this case at all that Hamilton had any illegal animosity. There's no suggestion in this case that Hamilton was biased against Mr. Woods based upon any impermissible factor. There's no suggestion that most of the people in this chain had any impermissible bias. It's undisputed that only the board had the authority to discipline an employee for more than five days, and plaintiff had already been suspended for threatening co-workers. There's also no argument that only the chief could present these charges to the board. Plaintiff admits that on page 32 of his brief. In this case, the court has a complete record of the events before the board. Everything was transcribed. Plaintiff had an opportunity to cross-examine witnesses, to call witnesses, to make arguments. We are not aware of any post-Staub, Staub being the Supreme Court case, we're not aware of any post-Staub case specifically on point in dealing with a circumstance where there was a full and complete hearing such as what's happened here. The Nichols case from this court in 2007 is the closest. It's pre-Staub, but it very clearly said that where there was an independent merit system protection board hearing, that cut off any nexus to any alleged discriminatory conduct before that. How would that reasoning apply counsel? Let's simplify things a little bit. Let's suppose you've just got one accuser who also has the power to bring charges, and that person simply lies out of some kind of illegal animus. Lies to the decision maker. Does that qualify as a biased decision under Staub? I think that the McKenna case that plaintiff cited in his reply, McKenna v. City of Philadelphia is a good example. In McKenna it was exactly that situation. It was the police lieutenant captain who said that he had issued an order to the plaintiff not to call a sergeant. It was the police captain who then claimed that the plaintiff had violated that instruction. So it was the police captain who was the principal witness and proponent of the charges. The difference there is that in that case, there was a quote-unquote... Under that circumstance that would satisfy the proximate cause analysis under Staub? I think it could with one clarification. I think in McKenna the court made it absolutely clear that it was distinguishing the kinds of it said that there was no record of it. There was no ability to call witnesses. The plaintiff couldn't cross-examine, and this is in footnote 10 of the McKenna decision. I believe, to answer your question, that if the person who is making the allegation of misconduct is the sole witness, it's uncorroborated, there's nothing else, or to use the Supreme Court's language in Staub, if the decision-maker is relying upon that statement, which could be a lie, then I think that there is an arguable basis for saying that it could be a motivating factor and that it should require a trier effect to decide what happened. But that's not what happened in this case. Well, so draw the line for us if you think there's a distinction. I do, Judge. If the line that I would draw is, especially in a circumstance where there is a full and complete hearing on the merits, where there is no dispute as to what evidence was considered by the decision-maker, then if the basis for the charge is coming from somebody who is alleged to have an illegal animosity, and if there's no corroboration, I think that that is something that would require a trier effect to decide. But where the individual who is supposedly biased is just part of the chain, and his or her evidence isn't relied upon to determine whether there was the underlying misconduct, then Staub would suggest that this is not a cat's paw case. Let me ask you this. Isn't the Board required to make findings of facts and conclusions of law after hearing like they had here? Because here, you know, they did not make any findings. They did eventually. Well, yeah, because the Circuit Court of Cook County said there are no findings. They were the reviewing authority and saw no findings had been made. Why weren't findings made? I can't answer that, Judge, other than perhaps that the Board wasn't familiar with... Because when you look at that in the context of they then made a determination that every allegation was true, that's somewhat problematic. It doesn't really help the Board's case. I think it does... That they didn't follow the normal procedure. I don't think that there's any evidence that they didn't follow the normal procedure, Judge. So it's not a requirement to have findings of fact and conclusions of law after the hearing is concluded? What I'm saying, Judge, is that in this case, the evidence before the Court is that there had been no discharge of any non-disciplinary employee since at least 1985. For 25 years, there hadn't been a discharge of a non-disciplinary employee. I think that it's simply a matter of the fact... I think it's simply that the Board didn't understand that the detailed findings of fact and conclusions of law would be necessary. So they didn't know it was a requirement because they hadn't had to utilize it? Obviously, the Circuit Court found that it was a requirement and the Board complied. Counsel, could I ask you about the issue of animus here, which frankly looks pretty thin to me. But we do have the training incident with the young man's job comment and this, what might be called a three options conversation. Why shouldn't we leave the interpretation of that evidence to a jury? You're exactly right, Judge. There's really two issues in this case. The first one is that if any alleged animosity from Chief O'Halloran is not attributed to the Board, then it's not a CASPA case and Judge Cannelli's decision was right and that should be affirmed just on that basis. But even if we were to assume that whatever O'Halloran believed was attributable to the Board, we believe, and we've argued very extensively in the briefs, that summary judgment was still appropriate. Because when you look at each of the individual instances on each of the individual theories, there is insufficient basis for the Court to believe any one of those factors formed a basis for the decision. So for instance, using age as the best example. The only allegation about age that's attributed to O'Halloran, if O'Halloran is the decision maker, is a statement more than a month before plaintiff's misconduct and two months before charges were submitted, when plaintiff was stoking a fire, which was a very O'Halloran, stoking the fire, and O'Halloran responded, yeah, it's a young man's job. That referred to the task of stoking the fire. It didn't have anything to do with being a training officer or anything else. And even if it did have to do with being a training officer, after June 3rd, actually after May 26th, the whole issue of being a training officer was resolved because Woods was no longer going to be the training officer. I see my time is up. For all of the reasons that I've stated, but even more because of the reasons in our brief, we would respectfully request that this court affirm the district court's decision. Thank you. We have one minute. Thank you, Judge. Fire Chief O'Halloran was the monkey in the cat's paw analysis. He wrote up those charges. He developed them himself. He looked at the rules of the Berwyn Fire Department and he picked out four. Violating a criminal law on disorderly conduct. Woods was never charged with that, but he was found guilty of it. Fighting and arguing. Hamilton said in his deposition in his statement, there was no fighting or arguing. The conversation ended cordially, but it was a charge for dismissal, upheld. Ungentlemanly conduct. Conversation among friends. These are specious the charges in Coleman and found that the charge didn't fit the rule violation. It said it was fishy. We think we have fishiness here. With respect to reliance, the two members of that police commission said they relied in part on the charges of dismissal brought by the commissioner, and he was a witness. And finally, that independent investigation that Supreme Court installed. Thank you very much. Thank you for reversal. Thanks to both counsel.